UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TINA NADDRA,                                              Case No. 1:16-cv-340

                    Plaintiff,                           Barrett, J.
                                                         Bowman, M.J.
        v.


COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


### REPORT AND RECOMMENDATION

Plaintiff Tina Naddra filed this Social Security appeal in order to challenge the Defendant's determination that she was not disabled.   *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review.   I conclude that the ALJ's finding of non-disability should be REVERSED IN PART AND REMANDED for further consideration under Sentence Four.

### I.  Summary of Administrative Record

On March 7, 2014, Plaintiff filed applications for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, alleging a disability since February 1, 2010 due to a heart condition. After Plaintiff's applications were denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").   On April 24, 2014, a hearing was held before ALJ Kristen King.  (Tr. 55-101).  Plaintiff appeared in Cincinnati, Ohio along with her attorney and an impartial vocational expert ("VE").   On August 29, 2014, ALJ King issued a decision, concluding that Plaintiff was not disabled.  (Tr. 38-49).  The Appeals Council

1

denied further review; therefore, ALJ King's decision remains as the final decision of the Commissioner.

Plaintiff was 45 years old on her alleged disability date but was 50 years old at the time of the ALJ's decision.  Plaintiff has the equivalent of a high school education, having obtained her GED.

Plaintiff stopped working in December 2006 due to a restructuring of the company with which she was then employed.  She chose not to return to work because she was the primary caretaker for her disabled adult daughter, who is hearing impaired and functions on a third grade level.  In addition, her son was a teenager and still in school.  From the date of her alleged disability in 2010 until May of 2013, she lived in a two story house with both her son and daughter.  However, in May of 2013, she was evicted and moved to a modular home with her disabled daughter.

Based upon her earnings record, Plaintiff's date last insured ("DLI"), for purposes of DIB, was December 31, 2011.  On her DLI, Plaintiff was still 47 years old, and still within the younger individual age category.  In order to qualify for DIB, Plaintiff was required to show that she became disabled prior to December 31, 2011.

The ALJ determined that Plaintiff had the following severe impairments: "very mild hypertrophic subaortic stenosis and mild mitral insufficiency; degenerative joint disease of the knee; depression; and anxiety."  (Tr. 38).   The ALJ determined that Plaintiff did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability.  (Tr. 39).   Instead, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform a range of sedentary level work with the following restrictions:

> The claimant was limited to no more than occasional balancing, stooping,
> kneeling, and crouching, while she could never crawl or climb ladders,

> ropes, and scaffolds.  The claimant was limited to climbing ramps or stairs no more than 5% of the workday and no more than five minutes in any one-hour period.  The claimant had to avoid concentrated exposure to extreme cold, extreme heat, wetness or humidity, poorly ventilated areas, and environmental irritants, such as fumes, odors, dusts, and gases.  The claimant had to avoid all use of dangerous machinery and exposure to unprotected heights.  The claimant was limited to simple, routine tasks. The claimant was limited to jobs in which changes in the work setting occur no more than approximately 15% of the workday.

(Tr. 41).

There is no dispute that Plaintiff cannot perform her past relevant work. However, based on the testimony of the vocational expert, ALJ King determined that Plaintiff still could perform jobs that exist in significant numbers in the national economy, including the representative occupations of information clerk, call-out operator, production worker, machine operator, and inspector.  (Tr. 48).  Alternatively, the ALJ determined that even if Plaintiff were further limited in her social functioning to interacting with others no more than 15% of the workday, she still would have been able to perform representative jobs of production worker, machine operator, and inspector. Therefore, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act.

In her Statement of Errors, Plaintiff argues that the ALJ erred: (1) by failing to give appropriate weight to the opinions of her treating physicians; and (2) by finding Plaintiff not to be credible.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to

prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

Whether considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can

4

still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

## B. *Sua Sponte* Consideration of Age Applicable to SSI Claim

Plaintiff's two claims of error do not include any error relating to the consideration of her age. Although this Court does not generally raise issues *sua sponte*, it is warranted in this case based upon what appears to be an error of law. *See Fowler v. Com'r of Soc. Sec.*, 2013 WL 5372883 (E.D. Mich. Sept. 25, 2013). The fact that Plaintiff changed age categories should have been considered to determine her eligibility for SSI,[1] even though Plaintiff remained squarely in the "younger individual" age category described by the ALJ through the expiration of her DIB insured status. Although the ALJ correctly noted that Plaintiff was 45 years old at the time of her alleged onset of disability, the ALJ failed to recognize that she had turned 50, defined as "closely approaching advanced age," by the date of the ALJ's adverse decision. The Medical-Vocational Grid Rules applied to Plaintiff once she turned 50, with Rule 201.17

---

[1]Unlike DIB, an award of SSI is limited to the month prior to the date of submission of the disability application.

5

directing a result of "disabled" for a 50 year old individual who is limited to sedentary work, as determined by the ALJ in this case.

The Social Security Agency created the Medical–Vocational Guidelines in order to standardize disability determinations in the fifth step of the sequential process, when the burden shifts to the Commissioner to show that jobs remain in the economy that Plaintiff can perform. *Heckler v. Campbell,* 461 U.S. 458, 461 (1983). The Grid Rules are "a shortcut that eliminate the need for calling in vocational experts." *Hurt v. HHS,* 816 F.2d 1141, 1142 (6th Cir.1987;.  The Grids contain tables that synthesize the relevant vocational factors of age categories, education and work experience.  20 C.F.R. pt. 404, subpt. P, app.2, Rule 200.00(a).

When an individual is "in a borderline situation," meaning close to the next age group, an ALJ should not apply the Grids "mechanically." 20 C.F.R. §416.963(b); *Bowie v. Com'r of Soc. Sec.*, 539 F.3d 395, 396-397 (6th Cir. 2008)).  Here, Plaintiff's 50th birthday occurred two months <u>after</u> her hearing before the ALJ, but two months <u>before</u> the written decision.  Thus, Plaintiff was in the "borderline" category at the time of her hearing, but had moved into the new age category at the time of the decision.  The Sixth Circuit has held that the salient date for determining an age category is the date of the ALJ's decision.  *Varley v. Sec'y of HHS*, 820 F.2d 777, 780 (6th Cir. 1987); *see also Rhodes v. Chater*, 121 F.3d 709, 1997 WL 452309 (6th Cir. Aug. 7, 1997) (Table, text available on Westlaw).

Because Plaintiff had attained the age of 50 by the time of the ALJ's decision, the ALJ should have considered and applied the Grids for purposes of Plaintiff's SSI application.  Appendix 2 to Subpart P of Part 404, Rule 201.00(g) states:

Individuals approaching advanced age (age 50–54) may be significantly limited in vocational adaptability if they are restricted to sedentary work. When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains. However, recently completed education which provides for direct entry into sedentary work will preclude such a finding. For this age group, even a high school education or more (ordinarily completed in the remote past) would have little impact for effecting a vocational adjustment unless relevant work experience reflects use of such education.

Rule 201.12 specifically directs that an individual in the "closely approaching advanced age" category who has a high school education but can perform only unskilled work is to be presumed "disabled." *Id.* Thus, under the Grid Rules, Plaintiff should have been found to be disabled, for purposes of SSI (but not DIB), not later than June 27, 2014, the date of her 50th birthday.

Because this error is raised *sua sponte* and was not briefed by either party, and because there remains some question as to whether Plaintiff should have been considered under the Grids at any time just before her 50th birthday, this case should be remanded under Sentence Four for further consideration of Plaintiff's SSI claim.

### C. Plaintiff's Two Claims of Error

Unlike the analysis of Plaintiff's SSI claim, the undersigned finds no error in the ALJ's DIB determination that Plaintiff was not disabled between her disability onset date of February 1, 2010 and her DLI of December 31, 2011.

#### 1. Medical Evidence

##### a. Plaintiff's Treating Physician's Opinion and the "Good Reasons" Rule

Plaintiff first argues that this case should be reversed based upon the ALJ's failure to give controlling weight to the opinions of Dr. Joffe, Plaintiff's treating cardiologist, and the ALJ's failure to provide "good reasons" for discounting his opinions.

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); SSR 96-2p.  The Commissioner is required to provide "good reasons" if the Commissioner does not give controlling weight to the opinion of a treating physician.  *Id.*

In most cases in which a failure to state "good reasons" is asserted, the argument is based upon the paucity of discussion by the ALJ for a rejection of a treating physician's opinion.  Typically, a plaintiff may claim that the reasons are not "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Com'r of Soc. Sec.*, 581 F.3d 399, 406-407 (6th Cir. 2009), quoting SSR 96-2p.  That is not the case here.   Indeed, the record reflects the ALJ's detailed and thorough discussion of Dr. Joffe's opinions over the course of many paragraphs and several pages.  Thus, on the record presented, Plaintiff's challenge to the "good reasons" standard focuses on the substance of the ALJ's analysis, which Plaintiff suggests is contrary to the evidence.

This Court will not reverse even if the undersigned would reach a different decision on the same evidence.  Instead, there is a "zone of choice" within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772-773 (6th Cir. 2001).   Because the ALJ's analysis of the treating physician's opinion is supported by substantial evidence in the record as a whole, I find no grounds for reversal of the DIB portion of the decision.

The ALJ began with a review of Plaintiff's clinical records and the opinions of Dr.

Joffe as follows:

> Diagnostic studies documented a number of cardiac problems, but the claimant's cardiologist has indicated that these conditions are clinically mild in nature.  Treatment notes indicate the claimant had longstanding complaints of various cardiac symptoms with a known mitral valve insufficiency, but her cardiologist, Dr. David Joffe, first diagnosed her with hypertrophic obstructive cardiomyopathy following an echocardiogram and Doppler study in May 2010….  Follow-up testing then showed slight improvement in the claimant's condition after she began a regimen of beta-blockers….  Dr. Joffe has since referenced the claimant's conditions as "very mild hypertrophic subaortic stenosis" and "mild mitral insufficiency."

(Tr. 42).  The ALJ also pointed out "large gaps in the claimant's cardiology record"

including a one-year gap prior to her May 2010 appointment, and a five-year gap in

treatment before that, prior to a March 2009 visit.  (Tr. 42 at n.4).

Despite Plaintiff's complaints, the ALJ found that records "suggest the claimant's

symptoms were less frequent and severe than her current reports indicate."  (Tr. 43).

For example, "the claimant repeatedly reported improvement in her symptoms after Dr.

Joffe began medically managing her condition…. While the claimant would later report

some amount of worsening in her condition, reports from Dr. Joffe continued to indicate

the claimant was doing well clinically."  (Tr. 43; *see also* records at Tr. 303, 307, 378

(7/21/10 noting "improving" with medical management, 8/13/10 stating "[s]he does feel

better," 8/29/11 noting "echo looks a bit better" and that her cardiac symptoms are

"stable if not slightly improved.")).  The ALJ pointed out that Dr. Joffe had "continually

insisted on conservative management," and the fact that Dr. Joffe noted that her

complaints were "not necessarily medical or cardiac" in nature but were instead related

to her numerous situational/emotional stressors.[2]  (Tr. 43).  Dr. Joffe noted that her cardiac symptoms were clinically stable, that her status was clinically adequate, and that her condition has not require surgical intervention. (*Id.*)  In several notes, Dr. Joffe suggested that several of Plaintiff's vaguely cardiac symptoms were probably as result of her situational stressors.  (Tr. 44).

The ALJ's analysis is well supported in the record.  For example, at a December 14, 2012 visit  – a year <u>after</u> Plaintiff's DLI – Dr. Joffe's notes focus primarily upon Plaintiff's "major social and family issues" which cause "major distress to the patient." (Tr. 458).  He remarks that she has only "mild subaortic stenosis" with "mild mitral insufficiency" for which she takes "generic low-dose medications which are appropriate." (*Id.*)  He discussed with Plaintiff that stress "can be responsible for much of her current symptomatology" which is "quite atypical" with "no additional cardiac medication or workup…needed."  (*Id.*)

More than two years after Plaintiff's DLI, on April 18, 2014, Dr. Joffe completed a medical source statement in which he opined  that Plaintiff could sit for two hours at a time and for eight hours total in a workday, and could stand/walk 2-3 hours total in a workday.  Those limitations are consistent with a sedentary level of work.  (Tr. 485-495). However, other limitations offered by Dr. Joffe were inconsistent with the ability to work. For example, Dr. Joffe opined that Plaintiff could not lift or carry even one pound.  In addition, in April 2014 Dr. Joffe "indicated that the claimant could not withstand the pressure of meeting normal work productivity standards, complete a normal workday or

---

[2]Those situational stressors included separation from her husband after he impregnated another woman, foreclosure of her house and eviction, and numerous issues related to the care of her mentally disabled and deaf adult daughter.  In December 2011, Dr. Joffe noted that Plaintiff was afraid to use her prescribed SSRI (psychiatric medication) because she was afraid it would interfere with her heart problems, which Dr. Joffe assured her was "simply not the case."  (Tr. 372).

workweek without interruptions from symptoms, or perform at a consistent pace without unreasonable breaks or rest periods."  (Tr. 45).

The ALJ acknowledged that Dr. Joffe had been Plaintiff's treating cardiologist since 2004, despite an "irregular interval of meetings" (including the referenced gaps in treatment), but found Dr. Joffe's 2014 assessment not to be entitled to controlling weight "because it is not well-supported and …is inconsistent with other substantial evidence in the record."  The ALJ went on to explain at length why he found Dr. Joffe's opinions not to be entitled to controlling weight:

> [L]arge portions of [Dr. Joffe's opinions] are not well-supported by medically acceptable clinical and laboratory diagnostic techniques. Other than citing the claimant's diagnoses, Dr. Joffe's opinion does not provide any clinical findings or diagnostic test results.  There is no discussion of any of the clinical findings from his numerous clinical examinations, nor is there any discussion of the numerous diagnostic studies on record other than his final note that the claimant's condition was not severe enough to merit surgery.  Dr. Joffe instead cited only the claimant's subjective reports of her symptoms in the few instances where he provided written explanations for his conclusions.  Then, there are also many instances in which Dr. Joffe noted rather severe limitations without any explanation for how or why the claimant would be so limited, such as when he indicted the claimant would miss three days of work per month or be unable to withstand the pressure of normal work standards, complete a workday or workweek without interruption, or perform at a consistent pace without unreasonable rest periods.

(Tr. 45).

Thus, the ALJ discounted Dr. Joffe's limitations in part because he failed to explain the basis for several opinions, such as why he believed she would miss work or be unable to withstand the pressure of normal work or perform at a consistent pace, and similarly failed to explain the basis for other extreme limitations.  *See* W*hite v. Com'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009)("conclusory statements from physicians are properly discounted by ALJs").  The ALJ further explained:

11

Dr. Joffe's assessment is also inconsistent with other substantial evidence. While Dr. Joffe cited the claimant's cardiac diagnoses and numerous symptoms that he attributed to her cardiac condition, this is inconsistent with the numerous references in his treatment notes indicating that many of the claimant's symptoms were "not medical or cardiac" in nature and that her situational stressors were instead responsible for or contributed to her reports of many cardiac-like symptoms. Dr. Joffe's statements in his medical source statement are additionally inconsistent with his various reports that the claimant's cardiac status was clinically stable and his references to "very mild hypertrophic subartic stenosis and mild mitral insufficiency."

(Tr. 45).

There are…additional reasons to support a finding that Dr. Joffe's opinion should be entitled to only some consideration. There are internal inconsistencies in Dr. Joffe's opinion statement, such as where he indicates the claimant is unable to perform work at a sedentary level despite explicitly noting [limitations consistent with sedentary work]….Then Dr. Joffe's reports that the claimant was completely unable to lift, carry, reach, push , or pull are also inconsistent with the claimant's extensive activity level, that has included shopping for groceries, preparing meals, washing dishes, doing laundry, sweeping floors, dusting, watering plans, and driving a car…. There is similarly little support for the identified limitation on the claimant's exposure to noise and vibration, as the only statement Dr. Joffe provided was that all environmental factors would adversely affect the claimant's ability to breathe…. Despite the issues noted with Dr. Joffe's medical source statement, this decision nevertheless provided some consideration to Dr. Joffe's opinions and adopted many of the identified limitations….

(Tr. 46).

Last but not least, the ALJ addressed the fact that Dr. Joffe had included statements that Plaintiff was "totally and permanently disabled" in several notes. The ALJ discounted those "disability" opinions because they were "very generalized statements that fail to identify any specific limitations" and because "they do not contain anything not already identified in the full medical source statement." (Tr. 45 at n.9).

Plaintiff argues that the ALJ's extensive analysis of Dr. Joffe's opinions was erroneous as a matter of law because, in Plaintiff's view, the ALJ "simply relies on her own interpretation" of Plaintiff's medical condition. (Doc. 11 at 11). Essentially, Plaintiff

12

asserts that her cardiac condition is more serious than determined by the ALJ. However, rather than pointing to any evidence not considered by the ALJ, Plaintiff relies chiefly upon a "MedlinePlus" on-line article that describes the diagnosis of "hypertrophic cardiomyopathy" as causing a "higher risk for sudden death than people without the condition," including as "a well-known cause of sudden death in athletes." (*Id.* at 12, citing https://www.nlm.nih.gov/medlineplus/ency/article/000192.htm). Plaintiff points out that Dr. Joffe first determined her to be disabled shortly after he diagnosed her with the condition shortly after her May 2010 echocardiogram. (Tr. 299). She states that many of her complaints correspond with the list of "common symptoms" in the article. Aside from the fact that this Court cannot consider evidence not presented to the ALJ, an article about a particular medical condition is not sufficient to prove that Plaintiff herself suffered from the most serious symptoms associated with that condition, and experiences those symptoms at a disabling level. [3] A diagnosis, standing alone, does not indicate the severity of an impairment or prove disability. *See Young v. Sec'y of HHS*, 925 F.2d 146, 151 (6th Cir. 1990).

As further evidence of the allegedly disabling nature of her condition, Plaintiff relies upon a record that reflects that Dr. Joffe "sought the opinion of a world renowned expert" in her condition. (See Tr. 313, note stating that Dr. Joffe "will be discussing her situation with Dr. Bernard Gersh from the Mayo Clinic. He is a world expert. He will be in Dayton"). However, the fact that Dr. Joffe consulted an expert who was in the area for a conference does not prove that Plaintiff's condition was disabling.

---

[3] Indeed, one of the first statements in the MedlinePlus article is that "Some people with the condition may have no symptoms."

Plaintiff cites, without any discussion, ten pages of medical records in which Dr. Joffe describes Plaintiff as "disabled" to support her contention that the medical evidence "overwhelmingly" supports Dr. Joffe's opinions.  (*See* Tr. 370, 383, 386, 486-492).  All but two of those ten pages, including five pages drawn from Dr. Joffe's April 2014 opinions, post-date December 31, 2011, Plaintiff's DLI.  Considering that Dr. Joffe himself described Plaintiff's condition as "progressive," (Tr. 486), the referenced pages do not support reversal of the ALJ's decision that Plaintiff failed to prove disability, for purposes of DIB, prior to December 31, 2011.

Most of the referenced pages contain only conclusory statements that Plaintiff is "disabled,"  which is an issue that is "reserved for the Commissioner." *See* 20 C.F.R. § 404.1527(d).  Dr. Joffe's statements on the ultimate issue of disability are not the type of medical "opinions" that are entitled to any deference.  None of the records cited by Plaintiff refute the ALJ's finding that the extreme limitations found by Dr. Joffe were not supported by his objective clinical findings.  For example, on the same day that Dr. Joffe opined that Plaintiff could lift "zero" weight, and had significant standing, walking and postural limitations, his treatment notes showed a mostly normal exam.  She was cooperative, not in any acute distress, her chest was clear to percussion and auscultation, her heart had regular rate and rhythm, she had no edema, no spinal abnormalities, normal muscle strength and tone, no gross motor or sensory deficits, appropriate affect, full orientation, and no difficulties with speech or language, and normal memory.  (Tr. 484). *Accord Tyra v. Sec'y of HHS*, 896 F.2d 1024, 1030 (6th Cir. 1990)(contrasting reported subjective complaints of pain with clinical findings).  The ALJ specifically (and accurately) noted that Dr. Joffe's opinions that Plaintiff was "completely unable to lift, carry, reach, push, or pull" were also "inconsistent with the claimant's

extensive activity level, that has included shopping for groceries, preparing meals [for herself and her children], washing dishes, doing laundry, sweeping floors, dusting, watering plants, and driving a car." (Tr. 46, citing Tr. 231-235). Dr. Joffe's opinions that Plaintiff would be frequently absent also are inconsistent with his opinion that she would be "prompt and regular in attendance." (*Compare* Tr. 486).

Plaintiff further argues that the ALJ erred in citing to Dr. Joffe's decision not to pursue surgical intervention. (Tr. 43). The referenced record of June 25, 2012 (again post-dating Plaintiff's DLI) states that Plaintiff was "[c]hronically totally disabled on the basis of that [cardiac] lesion. Poorly tolerated medication. Not a candidate for heart surgery. Could be in the future." (Tr. 469). On April 18, 2014, Dr. Joffe stated: "From a cardiac point of view, she is in a situation where she is not sick enough to require surgery but current medical therapy does not provide significant relief of symptoms." (Tr. 481). Plaintiff argues that those statements do "not negate the fact that she had a severe cardiac condition." (Doc. 11 at 13). However, there is no dispute that Plaintiff's cardiac condition was quite severe, to the point where she could perform only a partial range of sedentary work. The issue is not whether Plaintiff's condition is severe, but whether it disables her from even the limited range of sedentary work that the ALJ determined she could still perform.

The ALJ discounted only some of the functional limitations offered by Dr. Joffe. As with the ultimate decision on disability, the final responsibility for determining a plaintiff's RFC is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d). "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012). As in *Chapo*, the Sixth Circuit has

repeatedly upheld decisions where the ALJ rejected medical opinion testimony and determined RFC based on a combination of objective medical evidence and non-medical evidence, even where there is no medical opinion that corresponds precisely to the RFC found by the ALJ.  *See Ford v. Comm'r of Soc. Sec.,* 114 Fed. App'x 194 (6th Cir.2004); *Poe v. Comm'r of Soc. Sec.,* 2009 WL 2514058, at *7 (6th Cir.Aug.18, 2009); *see also Profitt v. Com'r of Soc. Sec.*, 2014 WL 7660138 at *6 (S.D. Ohio Dec. 12, 2014); *Hauser v. Com'r of Soc. Sec.*, 2014 WL 48554 (S.D. Ohio Jan. 7, 2014); *Hartman v. Colvin*, 2013 WL 5494449 (W.D. Ky. Oct. 2, 2013).  Having reviewed the evidence in the record as a whole, the undersigned finds no reversible error in the ALJ's evaluation of Dr. Joffe's opinions and corresponding formulation of Plaintiff's RFC through Plaintiff's DLI.

### b.  Non-examining State Agency Reviewers

The RFC determined by the ALJ in this case was less restrictive than the RFC opinions offered by Dr. Joffe, but much more restrictive than the opinions offered by two non-examining consulting physicians.  Plaintiff now criticizes the ALJ's decision to give those consulting physicians even "some" weight, implying that the consulting opinions were entitled to no weight at all.

The two consultants opined in June 2012 that Plaintiff was capable of work at the "light" exertional level.  The ALJ explained that she gave the consultants

> Some consideration because they provided a concise, detailed assessment of the clinical and diagnostic finding[s] while explaining the rationale for the limitations identified.  However, new evidence available at the hearing level, including the medical source statement provided by Dr. Joffe, supports a finding that the claimant was more limited than identified by either Dr. Das or Dr. Hughes.  This decision therefore further limited the claimant to arrange of sedentary work while further restricting the claimant's postural tolerances and adopting most of the environmental limitations identified by Dr. Joffe.

16

(Tr. 46).

Plaintiff argues that the ALJ's analysis was inadequate because the ALJ did not fully articulate all factors that she considered.  However, unlike the "good reasons" rule that applies to treating physicians, there is no similar articulation rule that applies to the evaluation of consulting physicians' opinions.  So long as the ALJ considered the relevant factors, the ALJ was not required to explain her analysis of each.  Here, the analysis was more than adequate for judicial review.  The ALJ cited relevant regulations and ultimately gave more weight to Dr. Joffe's RFC opinions than to the consulting physicians, despite the fact that the consultants' opinions were offered closer in time to Plaintiff's DLI.  Other than criticizing the ALJ for giving any weight at all to their opinions, Plaintiff does not identify any particular limitation offered by the consultants that was erroneously considered or adopted by the ALJ.

It is the responsibility of the ALJ to translate restrictions that are offered by medical providers into functional limitations.  *See Webb v. Com'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).  The RFC determined by the ALJ in this case is supported by substantial evidence in the record, including the Plaintiff's testimony, medical records, and the opinions of both Dr. Joffe and the two consulting physicians.  An RFC finding need not simply mirror one medical opinion.  *See* SSR 96-5p.

In her reply memorandum, Plaintiff asserts (for the first time) that the ALJ gave the consultants' opinions "more consideration" than she gave to the opinions of Dr. Joffe.  Citing *Gayheart v. Com'r of Soc. Sec.*, 760 F.3d 365 (6th Cir. 2013), she argues that the ALJ gave "more rigorous scrutiny" to the opinion of Dr. Joffe than she did to the consultants' opinions.  *Gayheart* is inapposite.  There, the ALJ relied chiefly on the opinions of consultants.  In this case, the ALJ stated that she was giving the opinions of

both consultants and Dr. Joffe only "some" weight. In the undersigned's view, the ALJ appears to have given slightly greater consideration to Dr. Joffe, adopting more of his RFC opinions. Plaintiff also claims for the first time in her reply memorandum that the ALJ "automatically" accepted the consultants' opinions. Given that the ALJ gave the opinions only partial weight and explained her reasons for doing so, it is clear that she did not.

Plaintiff contends that because the two consultants provided their opinions in 2012 before other evidence was submitted, including Dr. Joffe's 2014 opinions, the ALJ substituted "her own opinion for that of a medical expert." However, the ALJ is often – if not always - required to evaluate medical evidence that is submitted at different times. In *Blakley*, the Sixth Circuit reaffirmed the principle that an ALJ is legally permitted to credit a consultant's opinion over that of a treating physician, so long as the ALJ provides "good reasons" for doing so and acknowledges and explains the basis for crediting an opinion that was based on an incomplete record. Here, the ALJ did not credit the consultants' opinions over the opinions of Dr. Joffe except in minor respects, and the ALJ appropriately discussed the reasons for discounting the consultants' RFC opinions based on more recent evidence. Considering the fact that the consultants' opinions were closer in time to Plaintiff's DLI, and that the more recent evidence significantly post-dated Plaintiff's DLI, the ALJ's DIB decision reflects no error.

### c. Treating Psychologist

In a final subpart to her first claim of error, Plaintiff asserts that the ALJ erred in rejecting the opinion of her treating psychologist, Dr. William Kennedy,[4] who diagnosed Plaintiff with major depressive disorder, severe, and PTSD. (Tr. 46-47). More than two

---

[4] The ALJ erroneously transposed this provider's name as Kennedy Williams, Psy.D.

years after her DLI, Plaintiff's Global Assessment of Functioning ("GAF") scores included scores as 33 at an intake interview on March 27, 2014,[5] 35-38 in April 2014, briefly up to 55 on May 8, 2014 (Tr. 505) before falling back to 25 (Tr. 503, 501, 499), and rising again only modestly to 35-40 in June and July 2014. (*See, e.g.* Tr. 523, 525, 527-528).   Dr. Kennedy never completed a mental RFC assessment.   However, he opined during his initial intake interview in March 2014 (before treatment) that the "combination of her physical symptoms and the psychologically-based detriments lead her to being incapable of sustaining gainful employment."  (Tr. 518).  He explained that her "current" level of stress was "significantly exacerbating [her] symptoms."   With respect to her psychological issues, he explained that her "lack of income" led to her agreeing to stay in a home paid for by her ex-husband, which was initially offered with "no strings attached," but in March 2014 was causing increased stress due to her ex-husband's plan to "move into the house as well."  (*Id.*)

Plaintiff now argues that Dr. Kennedy's disability opinion during the intake interview should have been accepted by the ALJ.  As with Dr. Joffe's opinions, the undersigned would be remiss if I failed to point out that Dr. Kennedy's "opinion" that Plaintiff was disabled is dated long after Plaintiff's DLI for purposes of DIB.  However, the ALJ gave "little weight" to his "disability" opinion and also dismissed the unusually low GAF scores included in most of his clinical notes.

> A review of these notes shows that Dr. [Kennedy] opined the claimant had a global assessment of functioning (GAF) score ranging between 25 and 55…. Although GAF scores indicate a general level of limitation, they are particularly unhelpful in instances, such as here, where the examiner does not provide additional information concerning the specific areas in which

---

[5]At the time of an intake interview on March 27, 2014, Plaintiff reported that her adult son, daughter-in-law, and infant child were living with her in addition to Plaintiff's daughter.  (Tr. 514).  Plaintiff reported enjoying riding on the back of her boyfriend's motorcycle at the same intake interview.  (Tr. 515).

an individual is limited. It is also problematic that the lower GAF scores identified in [Dr. Kennedy's] notes – which suggest impairment in reality testing or communication, behavior influenced by delusions or hallucinations, serious impairment in communication or judgment, or major impairment to an inability to function in almost all areas of life – are not consistent with the claimant's reports concerning her activity level and the limited objective findings in these counseling notes.

(Tr. 46-47).

The undersigned finds no error. Dr. Kennedy arguably provided no medical "opinions" about functional limitations that were entitled to controlling weight. *See* 20 C.F.R. §404.1527(d)(opinions on the ultimate question of disability are not considered medical opinions but instead are issues reserved to the Commissioner); *see also Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("Since Dr. Naum made no medical judgments, the ALJ had no duty to give such observations controlling weight or provide good reasons for not doing so"). While an ALJ may consider GAF scores, he or she is not required to rely upon them as evidence of disability. *See Howard v. Com'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). Here, the ALJ's explanation for rejecting the unusually low GAF scores as proof of disabling mental limitations also is well supported by the record as a whole.

### 2. Credibility Assessment

Plaintiff's second assertion of error complains that the ALJ erred in finding her to be "not entirely credible." (Tr. 42). Plaintiff first argues that the ALJ should have found her to be disabled based upon her cardiac condition. While Plaintiff relies upon case law that discusses the difficulty of and legal standards applicable to the evaluation of subjective complaints of pain, Plaintiff herein does not claim that she is disabled from pain, *per se*, but instead from other symptoms such as shortness of breath and fatigue. Be that as it may, the same general legal standards apply.

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

Here, the ALJ provided multiple reasons for the adverse credibility assessment. The ALJ began by pointing out several inconsistencies between Plaintiff's testimony and her medical records. For example, Plaintiff had alleged significant problems with "daily" headaches and migraines, but her clinical records did not support a finding that migraines were even a severe impairment. (Tr. 39). Plaintiff does not dispute that finding.

Despite applying for disability benefits in February 2011, there were "absolutely no references to any mental health conditions or symptoms contained anywhere in the claimant's initial application," which "suggests that, at least at that time, the claimant did not feel her mental health conditions were particularly limiting." (Tr. 44-45). Earlier treatment records from April 2009 demonstrated that Plaintiff's depression had improved, and she was "doing well" on Lexapro. (Tr. 43, citing Tr. 359). In July 2009, her depression was stable. (Tr. 358). Two months after her alleged disability onset date, In April 2010, Plaintiff reported to her primary care physician, Dr. Seiler, that she was "doing well" and had no mental health problems despite discontinuing her Lexipro.

(Tr. 43, citing Tr. 357). She did not follow-up again until October 2011, shortly prior to her DLI, at which time she reported symptoms but was against using psychiatric medication. After consultation she agreed to try a new anti-depressant but later reported to her cardiologist that she was not taking it. (Tr. 43-44). Non-compliance with recommended treatment constitutes grounds for discounting a claimant's credibility. *See* 20 C.F.R. § 404.1530(b). Additionally, the 2+ year gap in treatment between Plaintiff's last appointment with Dr. Seiler in January 2012 to beginning psychiatric treatment Dr. Kennedy in late March 2014 (all of which was post-DLI) undermines Plaintiff's claims of disabling mental limitations. *See* SSR 96-7p. Later records suggest that medications prescribed in 2014 were "helpful in relieving symptoms of anxiety and depression." (Tr. 481).

As the ALJ pointed out, Plaintiff stopped working in 2006 to care for family members, not due to any health concerns. She testified that while at home caring for her children full-time, she was the primary caretaker for her teenage son and her disabled adult daughter. (Tr. 43-44, 72).

The ALJ noted significant activities of daily living, including extensive household chores and caring for two dogs, and social activities that included regular contact with family and friends, routinely going out to eat, and attending church on a somewhat regular basis. (Tr. 40). The ALJ further noted that Plaintiff reported "ambiguous limitations" in many areas despite any clear support. In addition, though she testified to daily crying spells, concentration deficits, anger, and a desire to avoid people, she "conceded that she drove her daughter to and from work twice per week and she helped supervise her son's high school marching band until he graduated in 2013." (Tr. 42). In addition, she "prepares meals, washes dishes, shops for groceries, does laundry, and

acts as caretaker to her mentally disabled and deaf adult daughter." (*Id.*)

Plaintiff criticizes the ALJ's reference to her level of daily activities. Plaintiff testified that she had to take rest periods when performing daily activities and often relied upon her disabled daughter for help (despite also being her daughter's caretaker). She also testified, in response to inquiry from her attorney, that she had many bad days where she was unable to perform any activities. (Tr. 65-77). However, Plaintiff's reliance upon her own testimony concerning her alleged need for rest periods and number of "bad days" is not sufficient to overturn the ALJ's credibility assessment, which is supported by substantial evidence in the record as a whole.

Last, Plaintiff cites *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011) in which the Sixth Circuit criticized an ALJ's focus on a claimant's ability to do certain activities to discredit a treating source's opinion. *Cole* was not a credibility case. In any event, the ALJ's reference to the plaintiff's daily activities in *Cole* was not the reason for reversal. Rather, the Sixth Circuit faulted the ALJ's incomplete analysis, which cited <u>only</u> the plaintiff's daily activities without completing analysis of other factors prior to rejecting the treating source opinion. *Id.* at 938. Compounding the error, *Cole* involved a second judicial appeal 4 years after remand, and the ALJ failed to recognize that Cole's testimony about his daily activities "changed between the first hearing and the second hearing." *Id.* Moreover, the Commissioner conceded that the ALJ had erred by failing to articulate what weight he was giving to the treating psychiatrist's RFC assessment. *Id.* In short, *Cole* is distinguishable on multiple fronts. Regulations clearly permitted the ALJ to consider Plaintiff's daily activities when assessing her credibility.

### III. Conclusion and Recommendation

Because the issue has not been briefed but has been raised *sua sponte* based upon records suggesting that Plaintiff turned 50 shortly after the hearing before the ALJ and prior to the ALJ's written decision, the undersigned recommends further fact-finding concerning Plaintiff's SSI claim. *Sullivan v. Finkelstein,* 496 U.S. 617, 625–26, 110 S.Ct. 2658, 2664, 110 L.Ed.2d 563 (1990) (sentence four provides appropriate relief when evidence on record is insufficient to support the Secretary's conclusions and further fact finding is necessary); *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 173 (6th Cir. 1994).

Accordingly, for the reasons stated, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as to the conclusion that Plaintiff was not disabled for purposes of DIB, but **REVERSED AND REMANDED** for further of Plaintiff's SSI claim. Consistent with this recommendation, judgment should be entered and this case should be **CLOSED.**

                        */s Stephanie K. Bowman*
                        Stephanie K. Bowman
                        United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TINA NADDRA,                                    Case No. 1:16-cv-340

        Plaintiff,                        Barrett, J.
                                               Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).